IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA,       )
                                )
          v.                    )
                                )   1:11cr407
ANTONIO SANDOVAL,               )
                                )
       Defendant.               )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on (1) Defendant's Motion to Dismiss the Indictment or, in the Alternative, Transfer the Case to the Central District of California (the "Motion to Dismiss or Transfer") and (2) Defendant's Motion to Suppress Evidence and Request for a Hearing Pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) (the "Motion to Suppress"). For the following reasons, the Court will deny Defendant's Motion to Dismiss or Transfer and deny Defendant's Motion to Suppress.

## I. Background

On November 6, 2010, DEA agents conducted a traffic stop of a tractor trailer in New York. (Mot. to Suppress [Dkt. 38] Ex. A ¶ 1.) During the stop, agents located a hidden compartment in the tractor trailer, which contained sixteen kilograms of cocaine and approximately $400,000 in United States

currency. (*Id.*) The cocaine and cash were contained in sealed packaging. (Gov't Resp. to Mot. to Suppress [Dkt. 43] at 2.) Following the traffic stop, the driver of the tractor trailer ("Confidential Source" or "CS") agreed to cooperate with law enforcement and provide information regarding the drug trafficking organization operated by Defendant Antonio Sandoval ("Defendant"). (Mot. to Suppress Ex. A ¶ 1.)

CS's role in the drug trafficking organization was to smuggle multi-kilogram quantities of cocaine from California to the Washington, D.C. area and the Bronx area in New York on a monthly basis. (Mot. to Suppress Ex. A ¶ 2.) CS also smuggled separate loads of cocaine for Defendant's business partner and co-defendant, Bobby Garcia. (*Id.*) Additionally, CS picked up large sums of money from Defendant's brother and co-defendant, Jesus Sandoval, in Maryland and delivered it to Defendant in California. (*Id.*)

CS began working for the drug trafficking organization in 2006, which was then led by Defendant and Ruben Gil. (Mot. to Suppress Ex. A ¶ 3.) Gil asked CS to pick up cash related to drug smuggling in the Washington, D.C. area and New York. (*Id.*) Gil also sold CS a tractor trailer with a hidden compartment designed for smuggling narcotics. (*Id.*) This hidden compartment was located in the truck's cab and was designed to conceal up to 100 kilograms of cocaine. (*Id.*) The tractor

trailer was subsequently seized by DEA agents during CS's November 2010 arrest. (*Id*.)

CS stated that from 2006 to 2008, he picked up cash from Jesus Sandoval in Maryland five to seven times, which he then delivered to Gil in California. (Mot. to Suppress Ex. A ¶ 4.) CS drove through the Eastern District of Virginia en route back to California. (Mot. to Suppress Ex. A ¶ 5.) The cash was packaged in sealed bags, with the amount varying between $400,000 and $600,000, and CS receiving a two percent fee. (Mot. to Suppress Ex. A ¶ 4.) CS believed that Gil turned the money over to Defendant, though he did not personally observe this occur. (Mot. to Suppress Ex. A ¶ 5.)

In 2008, Gil was arrested for drug trafficking, and CS temporarily ceased making deliveries of cash. (Mot. to Suppress Ex. A ¶ 6.) Though CS had previously seen Defendant at a trucking lot operated by Gil, he was not formally introduced to Defendant until 2010. (*Id*.) He was at that time reemployed by the drug trafficking organization, which was now led exclusively by Defendant. (Mot. to Suppress Ex. A ¶ 7.) Beginning in January 2010, CS transported cash from Jesus Sandoval in Maryland to Defendant in California on a monthly basis. (*Id*.) The amounts varied between $375,000 and $1.2 million. (Mot. to Suppress Ex. A ¶ 9.) In addition, from August 2010 to October 2010, CS smuggled three multi-kilogram quantities of cocaine

from California to the Washington, D.C. area.  (*Id.*)  Delivery of both the cocaine and the cash were coordinated with Defendant and Jesus Sandoval.  (*Id.*)

In December 2010, CS reported to DEA agents that Defendant had contacted him about his arrest and asked if he needed money or a lawyer.  (Mot. to Suppress Ex. A ¶ 10.) Defendant also asked CS where the "heat" came from that led to his arrest.  (*Id.*)  On January 19, 2011, CS participated in a phone call with Defendant, which was monitored by the DEA. (Mot. to Suppress Ex. A ¶ 11.)  During this phone call, CS spoke to Defendant about his need for money and about Garcia.  (Mot. to Suppress Ex. C; Gov't Resp. to Mot. to Suppress at 3.)  After CS explained to Defendant his need for money to pay his bills, Defendant responded, "Well let me see what I can gather."  (Mot. to Suppress Ex. C at 3; Gov't Resp. to Mot. to Suppress at 3.) CS informed DEA agents that, put into context, this discussion related to the debt Garcia owed him for the delivery of cocaine. (Gov't Resp. to Mot. to Suppress at 3.)

On April 11, 2011, CS made a monitored phone call to Garcia, in which CS asked for payment of the $40,000 owed to him.  (Mot. to Suppress Ex. A ¶ 12.)  Garcia agreed to pay the money, but instructed CS to set up a meeting so they could speak in person rather than over the phone.  (*Id.*)  CS made a second monitored phone call to Garcia, also on April 11, 2011, in which

Garcia described his strained relationship with Defendant following CS's arrest.  (Mot. to Suppress Ex. A ¶ 13.)  During this phone call, Garcia stated that Defendant tried to have him "hit," *i.e.*, assassinated, and that he was in turn going to "take care of" Defendant.  (*Id.*)

DEA agents commenced surveillance of Defendant's residence on June 16, 2011, and observed two vehicles later specified in the search warrant at issue.  (Mot. to Suppress Ex. B, Statement of Probable Cause ¶ 2.)  DEA agents conducted surveillance of Defendant's residence on three additional occasions, the final time occurring on August 8, 2011.  (Mot. to Suppress Ex. B, Statement of Probable Cause ¶¶ 3-5.)  The DEA's surveillance did not uncover any incriminating conduct on the part of Defendant.  (*See generally* Mot. to Suppress Ex. B, Statement of Probable Cause ¶¶ 2-5.)

On August 5, 2011, Magistrate Judge Davis issued a criminal complaint and arrest warrants charging Defendant and three co-defendants with conspiring to distribute greater than five kilograms of cocaine in violation of federal law.  [Dkt. 1]  On August 8, 2011, DEA agents obtained a search warrant authorizing the search of Defendant's residence in San Fernando, California.  (Mot. to Suppress Ex. B; Gov't Resp. to Mot. to Suppress at 3.)  The search warrant also authorized the search of two specific vehicles, as well as additional vehicles located

on the premises, for items listed in the search warrant. (Mot. to Suppress Ex. B; Gov't Resp. to Mot. to Suppress at 3.) DEA agents served the search warrant on August 9, 2011. (Mot. to Suppress at 1; Gov't Resp. to Mot. to Suppress at 3-4.) The agents located and seized United States currency (approximately $150,000 of which was contained in sealed packaging), documents, vehicles, and other property including a sealing machine, sealer bags and packaging materials, and firearms. (Mot. to Suppress at 1; Gov't Resp. to Mot. to Suppress at 4.)

On September 8, 2011, a federal grand jury returned a one-count superseding indictment against Defendant and the three co-defendants. [Dkt. 26.] Defendant was charged with conspiracy to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Superseding Indictment [Dkt. 26] at 1-2, 4.) The indictment alleged that from in and around January 2010 through on or about August 9, 2011, Defendant shipped and caused to be shipped multi-kilogram quantities of cocaine from California to East Coast locations including Washington, D.C. and New York. (Superseding Indictment at 1-2.)

Defendant moves to suppress the evidence seized from his residence based on a lack of probable cause in the aforementioned search warrant. Defendant also requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

[Dkts. 38, 39.]  Second, Defendant seeks to dismiss the indictment for improper venue or, in the alternative, transfer the case to the Central District of California.  [Dkt. 30.]  The Government filed responses [Dkts. 42, 43] to the Motion to Dismiss or Transfer and to the Motion to Suppress on October 28, 2011.  Defendant's motions are before the Court.[1]

## II.  Analysis

### A.  Motion to Dismiss or Transfer

Defendant argues that the indictment should be dismissed based on improper venue or, in the alternative, that the case should be transferred to the Central District of California.  The Court will address each request in turn.

### 1.  Motion to Dismiss

The Constitution requires that "the Trials of all Crimes . . . shall be held in the State where the said Crimes shall have been committed."  U.S. Const. Art. III, § 2.  For continuing offenses, such as the conspiracy charge at issue here, venue may be established in any district "in which such offense was begun, continued, or completed."  18 U.S.C. §

---

[1] In addition, Defendant moved for an order requiring the Government to disclose whether or not it intended to submit evidence of Defendant's prior bad acts pursuant to Federal Rule of Evidence 404(b).  [Dkt. 40.]  In its response, the Government indicated that it did not plan to introduce such evidence [Dkt. 44], thereby rendering the issue moot.  Defendant also filed a motion *in limine* [Dkt. 48] to exclude certain evidence from the Government's case-in-chief and requested permission for attorney *voir dire*.  [Dkt. 49.] The Court denied Defendant's request for attorney *voir dire* in open court, noting that it would take into consideration any proposed questions Defendant wished to submit.  Given Defendant's guilty plea, the motion *in limine* is, of course, moot.

3237(a).  Thus, in a conspiracy case, "a prosecution may be brought in any district in which any act in furtherance of the conspiracy is committed."  *United States v. Al-Talib*, 55 F.3d 923, 928 (4th Cir. 1995) (citation omitted).  Moreover, an act in furtherance of the conspiracy committed by one conspirator in a given district makes venue proper in that district as to all co-conspirators.  *United States v. Anderson*, 611 F.2d 504, 509 n.5 (4th Cir. 1979).  To establish venue, the Government need only show that an act occurred in this District by a preponderance of the evidence.  *United States v. Porter*, 821 F.2d 968, 975 (4th Cir. 1987).

Here, the indictment alleges that cocaine was transported through the Eastern District of Virginia in furtherance of Defendant's conspiracy.  Similar conduct has been found to support venue in other conspiracy cases.  *See Al-Talib*, 55 F.3d at 928 (finding venue appropriate in the Eastern District of Virginia where one co-conspirator traveled through Virginia in connection with drug conspiracy, co-conspirator's car was registered in Virginia, and seized documents indicated that some of co-conspirator's distributors operated in Virginia.)  As the Fourth Circuit noted in *Al-Talib*, far less substantial acts have served to establish venue in conspiracy cases.  *See, e.g.*, *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir. 1994) (telephone calls to district established venue);

*see also United States v. Shearer*, 794 F.2d 1545, 1550-51 (11th Cir. 1986) (two instances of travel through district in furtherance of conspiracy satisfied venue requirement). Moreover, as noted above, the acts of the unidentified co-conspirator who allegedly transported cocaine through this District establish venue for all co-conspirators, including Defendant.  Thus venue is proper in the Eastern District of Virginia, and Defendant's motion to dismiss will be denied.

## 2.  Motion to Transfer

Defendant alternatively requests that the Court transfer this case to the Central District of California.  Upon the defendant's motion, a district court may transfer a criminal case to another district "for the convenience of the parties, any victim, and the witnesses, and in the interest of justice." Fed. R. Crim. P. 21(b).  The decision whether to transfer a case is within the "sound discretion of the district court." *United States v. Heaps*, 39 F.3d 479, 482 (4th Cir. 1994).  The defendant bears the burden of proving that transfer is appropriate.  *United States v. Offill*, No. 09cr134, 2009 WL 1649777, at *2 (E.D. Va. June 10, 2009).  "For a defendant to succeed on a [Rule 21(b) transfer motion], the defendant must demonstrate that prosecution of the case in the district where the count was properly filed would result in a substantial balance of inconvenience to the defendant." *United States v.*

*Ferguson*, 432 F. Supp. 2d 559, 562 (E.D. Va. 2006) (internal quotation marks omitted).

In deciding whether transfer is appropriate, the court should consider the following factors, known as the *Platt* factors:

> (1) location of the defendant;
>
> (2) location of witnesses;
>
> (3) location of events likely to be in issue;
>
> (4) location of documents and records;
>
> (5) disruption of the defendant's business;
>
> (6) expense to the parties;
>
> (7) location of counsel;
>
> (8) relative accessibility of place of trial;
>
> (9) docket conditions in each district; and
>
> (10) any other specific element which might affect the transfer.

*Heaps*, 39 F.3d at 482 (citing *Platt v. Minn. Mining & Mfg. Co.*, 376 U.S. 240, 243-44 (1964)).

a.   <u>Location of Defendant</u>

Defendant resides in the Central District of California. However, criminal defendants "have no right to be tried in their home district, nor does the location of the defendant's home have independent significance in determining whether transfer to that district would be in the interests of

10

justice." *Offill*, 2009 WL 1649777, at *3 (internal quotation
marks omitted).  Moreover, while Defendant might live in the
Central District, this case is not local to that forum, but
rather involves a conspiracy to transport cocaine across the
country.  *See United States v. Giannone*, 360 F. App'x 473, 478
(4th Cir. 2010) (affirming denial of transfer motion where
defendant lived in New York but the violations occurred over the
Internet between New York and South Carolina).  Thus, while this
factor supports transfer, it is entitled to little weight.

> b.  Location of Witnesses

Defendant asserts that all of his witnesses reside in
the Central District of California.  But Defendant neglects to
specify who these witnesses are, or what testimony they would
provide.  "Generally, a naked allegation that witnesses will be
inconvenienced by trial in a distant forum will not suffice for
transfer." *Offill*, 2009 WL 1649777, at *3 (internal quotation
marks omitted).  Rather, a defendant "must offer specific
examples of witnesses' testimony and their inability to testify
because of the location of the trial." *Id.* (internal quotation
marks omitted).

Moreover, as the Government points out, this case
involves three co-defendants, all of whom live in the
Washington, D.C. area or the Eastern District of Virginia.  The
Government also represents that all of its witnesses, with the

possible exception of one or two law enforcement witnesses, live in this District, Washington, D.C., or on the East Coast. *See United States v. Escamilla*, 467 F.2d 341, 345 (4th Cir. 1972) (affirming denial of transfer motion where defendant's character witnesses resided in the Central District of California, but experts and investigators who would testify for Government all had regular places of business in the Eastern District of Virginia). Thus, this factor weighs against transfer.

c.   <u>Location of Events</u>

In arguing that the location of events favors transfer, Defendant asserts that his alleged misconduct took place in the Central District of California, as did the execution of the search warrant at issue in the Motion to Suppress. But Defendant was indicted for participating in a conspiracy to transport cocaine from coast to coast. *See United States v. Farkas*, No. 10cr200, 2010 WL 3835110, at *3 (E.D. Va. Sept. 24, 2010) (finding "nothing inherently local" in allegations involving nationwide fraud).

In addition, many of the activities in furtherance of the conspiracy occurred outside the Central District of California. What initially prompted the government's investigation was the apprehension of CS, who was transporting cocaine in New York. Shipments of cocaine were allegedly transported to the Washington, D.C. area as well. Moreover, CS

made numerous trips to Maryland to meet with Defendant's brother and co-defendant, Jesus Sandoval, and collect money for the shipments of cocaine.  In short, the allegations in this case extend to nationwide activity.  This factor does not, therefore, support transfer.

d.    Location of Documents and Records

Defendant argues, in conclusory fashion, that "[a]ll evidence necessary to prove defendant's innocence" is located in the Central District of California.  (Mot. to Dismiss or Transfer [Dkt. 30] at 6.)  According to Defendant, this evidence includes, but is not limited to, personal documents, bank records, mortgage and escrow documents, and employment records. (*Id.*)  Beyond this, Defendant does not specify what documents he plans to introduce or explain how those documents will be helpful to him at trial.  Defendant makes no showing that the volume of documents located in the Central District of California is so substantial that transportation might prove problematic or that the documents cannot be transmitted electronically.  Thus, this factor does not militate in favor of transfer.

e.    Disruption of the Defendant's Business

Defendant points to no business enterprise, which would be disrupted by virtue of going to trial in this District. In any event, other courts have observed that "any criminal

trial would disrupt [a defendant's] work, regardless of the
location of the trial." *Farkas*, 2010 WL 3835110, at *5.
Accordingly, this factor does not support transfer.

### f. Expense to the Parties

Defendant asserts that his witnesses, all of whom
reside in the Central District of California, do not have the
financial resources to travel cross-country and pay for
accommodations in this District.  He also argues that most of
the Government's witnesses are law enforcement agents, whose
travel expenses would be defrayed by the Government.  The Court
assigns little weight to Defendant's argument, again because he
does not specify what witnesses he plans to call or describe
what testimony they would provide.  Moreover, while it may cost
Defendant more to go to trial in this District, it would cost
the Government and Defendant's co-defendants more if this case
were to be transferred.  "Merely shifting the burden of expense
from one party to another is not a good reason for transfer."
*United States v. Kanner*, No. 07-CR-1023, 2008 WL 2663414, at *7
(N.D. Iowa June 27, 2008).

### g. Location of Counsel

Defendant points out that his attorney is located in
the Central District of California.  Courts have held that
defense counsel's residence outside of a district "is an
inconvenience of [the defendant's] own choosing.  No claim is

14

made, or can be made, that competent and experienced counsel cannot be found in this district." *United States v. Lindh*, 212 F. Supp. 2d 541, 552 (E.D. Va. 2002). In addition, Defendant's co-defendants all have counsel who are local to this District. *See Kanner*, 2008 WL 2663414, at *7 (location of attorneys weighed heavily against transfer where the defendant's counsel was located in the Southern District of Florida, but the Government's attorneys and co-defendants' counsel were located in Iowa). For these reasons, this factor weighs against transfer.

h.    <u>Accessibility</u>

The parties did not raise this factor. The court notes, as others in this District have, that the Alexandria federal courthouse is surrounded by hotels and within walking distance of public transportation to Washington Reagan National Airport, which is located just five miles away. *See Farkas*, 2010 WL 3835110, at *6; *Offill*, 2009 WL 1649777, at *5. Given the high level of accessibility to this courthouse, this factor does not support transfer.

i.    <u>Docket Conditions</u>

According to the most recent statistics, the Eastern District of Virginia has a median time of 10 months from filing

to disposition of a criminal case by trial.[2]  The corresponding

statistic in the Central District of California is 24.9 months.[3]

Transfer of this case to the Central District of California

could result in substantial delay.  The potential for delay is

compounded by the fact that this case is set for trial just

eleven days after the hearing date for this motion.  Thus, this

factor militates against transfer.

### j. Special Considerations

As the Government points out, three of Defendant's co-

conspirators have been indicted in this District.  To the extent

the case involves overlapping evidence and witnesses, the

Government may conserve resources by prosecuting Defendant here.

*See Offill*, 2009 WL 1649777, at *5.  And "since all of these

prosecutions arise from the same conspiracy . . . disposing of

the cases in a unified manner is advisable."  *Id.* (citing *United

States v. Smallwood*, 293 F. Supp. 2d 631, 640 (E.D. Va. 2003)).

In sum, the majority of factors weigh against

transfer.  Defendant raises several grounds which he claims

support transfer, but fails to provide specifics.  Accordingly,

Defendant has not demonstrated "a substantial balance of

inconvenience," *Ferguson*, 432 F. Supp. 2d at 562, and the motion

to transfer will be denied.

---

[2] *See* Judicial Business of the U.S. Courts, 2010 Annual Report, Table D-6.
[3] *See id.*

B.  Motion to Suppress

1.  Probable Cause

Defendant challenges the validity of the instant search warrant, contending that it was not supported by probable cause.  Probable cause determinations are based on the "totality of the circumstances" of each case.  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Probable cause is found "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found."  *Ornelas v. United States*, 517 U.S. 690, 696 (1996).  However, the mere fact that a target of search committed a crime does not automatically warrant search of an address.  *See United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993).  Rather, the crucial element is whether the affidavit and materials presented to the magistrate could lead to a reasonable belief that the items to be seized will be found in the place to be searched.  *Id.* (citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 & n.6 (1978)).  As the Fourth Circuit has held, "the nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."  *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988) (expressly adopting the logic of the Fifth, Sixth, Eighth, and Ninth Circuits).

Here, the instant search warrant was based on information provided by a confidential informant, several monitored phone calls made by the confidential informant, and the surveillance of Defendant's residence.  Defendant advances several arguments why he believes his motion to suppress should be granted: (1) the search warrant affidavit failed to establish probable cause because it was (a) based on stale information; (b) relied on uncorroborated information from a confidential informant; and (c) contained misrepresentations by the affiant;[4] and (2) the searches of automobiles not specifically listed in the search warrant were unsupported by probable cause.  The Court begins by addressing Defendant's arguments as to staleness and the unspecified automobiles.

a.  Staleness

The Fourth Circuit has held that "[a] valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*."  *United States v. Doyle*, 650 F.3d 460, 471 (4th Cir. 2011) (emphasis in original) (quoting *United States v. McCall*, 740 F.2d 1331, 1335-56 (4th Cir. 1984)).  One context in which staleness becomes an issue is where the information on which the search warrant rests is too

---

[4] Defendant's argument that the search warrant affidavit contained misrepresentations is addressed in the Court's discussion of the *Leon* good faith exception in Section II.B.2, *infra*.

old to furnish "present" probable cause.  *McCall*, 740 F.2d at 1336.  However, "[t]he vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit."  *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (quoting *United States v. Rhynes*, 196 F.3d 207, 234 (4th Cir. 1999)).  Rather, a court "must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized."  *Id.* (quoting *Rhynes*, 196 F.3d at 234).

As Defendant points out, the search warrant was not executed until nine months after CS's arrest for smuggling cocaine.  CS's monitored call with Defendant occurred seven months before execution of the search warrant, while the surveillance conducted by DEA agents in the months immediately prior to execution contributed little, if anything, to a finding of probable cause.

It is significant, however, that Defendant has been charged based on his alleged involvement in an ongoing conspiracy.  Indeed, according to the search warrant affidavit, Defendant's drug trafficking organization has been operating since at least 2006.  Courts have routinely rejected staleness challenges where, as here, the defendant is charged not with a

"mere isolated violation[] of the law, but criminal activities
of a protracted and continuous nature." *See id.* (internal
quotation marks omitted) (rejecting the staleness challenge of a
defendant who contended there was no probable cause to believe
he had engaged in counterfeiting from October 1997 until the
search warrant issued in July 1998); *see also Rhynes*, 196 F.3d
at 233-34 (information in search warrant that was over two years
old was not stale), *vacated in part on other grounds*, 218 F.3d
310 (4th Cir. 2000); *McCall*, 740 F.2d at 1337 (reliance on
police officer's statement that defendant had displayed stolen
revolver to him seven months prior did not render search warrant
stale).

        Moreover, as in *Rhynes*, the search warrant authorized
authorities to search for, among other things, books, notes,
ledgers, financial records, bank statements, and address books.
(*See* Mot. to Suppress Ex. B, Items to be Seized.)  These are
"records and personal papers which are not ordinarily destroyed
or moved from one place to another."  *Rhynes*, 196 F.3d at 234.
For these reasons, the Court rejects Defendant's argument that
the search warrant was unsupported by probable cause because it
was based on stale information.

                    b.    Automobiles

        In a supplemental motion, Defendant argues that
authorities exceeded the scope of the search warrant by

searching two vehicles located at Defendant's residence -- a
1936 Chrysler Airstream and a 1936 Cadillac.  Specifically,
Defendant contends that the search warrant did not describe
these vehicles with the required particularity.  In searching
the two vehicles, authorities discovered money and documents
related to drug trafficking.

The fact that these two vehicles were not expressly
referenced in the search warrant does not mean that they were
outside its scope.  "Where a warrant authorizes the search of an
entire property or premises, the scope of the warrant includes
automobiles on the property or premises that are owned by or are
under the dominion and control of the premises owner or which
reasonably appear to be so controlled."  *United States v.
Patterson*, 278 F.3d 315, 318 (4th Cir. 2002).  Defendant makes
no suggestion that the vehicles were not parked on his property.
Thus, the Court finds that the vehicles were within the scope of
the search warrant.

### c.  Confidential Informant

Defendant attacks the information provided by CS,
arguing in particular that it was inadequately corroborated.  In
*Illinois v. Gates*, 462 U.S. 213, 230-31 (1983), the Supreme
Court replaced the rigid two-prong test applied to confidential
informants with a flexible, common sense approach that takes
into consideration the totality of the circumstances.  Still, a

confidential informant's veracity, reliability, and basis of knowledge are highly relevant and should be understood as closely intertwined issues that illuminate the common sense, practical question of whether probable cause exists. *Id.* at 230.

The Fourth Circuit has noted that "[a]n informant's tip is rarely adequate on its own to support a finding of probable cause." *United States v. Miller*, 925 F.2d 695, 698 (4th Cir. 1991) (citation omitted). And, an "important factor in determining whether an informant's tip has established probable cause is the degree to which the arresting officer can corroborate that tip." *Id.* (citations omitted). Here, there was *some* corroboration of CS's information, though it was not as compelling as the Government makes it out to be. As the Government points out, CS participated in a monitored phone call with Defendant, in which he discussed his November 2010 arrest and his need for money. CS informed DEA agents that this conversation related to money Garcia owed Defendant for transporting cocaine. This is not apparent, however, on the face of the conversation. (*See generally* Mot. to Suppress Ex. C.) Still, the conversation does demonstrate that CS knew Defendant personally and touches on issues -- albeit vaguely -- related to CS's transportation of cocaine, including his arrest. The surveillance of Defendant's residence failed to corroborate

the information provided by CS in a meaningful way.  DEA agents
did not witness incriminating conduct on the part of Defendant
in any of their four surveillance expeditions.  The only useful
information derived from the Government's surveillance, as far
as the Court can see, is the fact that Defendant resided at the
property which later became the subject of the search warrant.
However, the Court ultimately need not resolve whether the
search warrant was supported by probable cause because of the
applicability of the good faith exception.

### 2.  Good Faith Exception

Because the good faith exception applies to even a
"subsequently invalidated" warrant, the Court may resolve
Defendant's motion on its applicability alone, without
addressing probable cause.  *See United States v. Bynum*, 293 F.3d
192, 194-95 (4th Cir. 2002).  Under the good faith exception, a
court should not suppress the fruits of a search conducted under
authority of a search warrant unless "a reasonably well trained
officer would have known that the search was illegal despite the
magistrate's authorization."  *United States v. Leon*, 468 U.S.
897, 922 n.23 (1984).  The Supreme Court has identified four
situations in which an officer's reliance on a search warrant
would not be objectively reasonable, holding that the exception
would not apply when:

> (1)  the magistrate was misled by
>       information in an affidavit that the
>       officer knew was false or would have
>       known was false except for the
>       officer's reckless disregard of the
>       truth;
>
> (2)  the magistrate wholly abandoned his
>       detached and neutral judicial role;
>
> (3)  the warrant was based on an affidavit
>       that was so lacking in indicia of
>       probable cause as to render official
>       belief in its existence entirely
>       unreasonable; or
>
> (4)  the warrant was so facially deficient*,*
>       by failing to particularize the place
>       to be searched or the things to be
>       seized that the executing officers
>       cannot reasonably presume it to be
>       valid.

*United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995)

(quoting *Leon*, 468 U.S. at 923).

Defendant contends that the first and third circumstances are present here, thus precluding application of the good faith exception.[5] This argument is without merit. Defendant's allegation of misleading information deals with the content of the monitored phone call between CS and Defendant. The Government argues that when viewed in context, the description of the call in the search warrant affidavit is accurate.

---

[5] Defendant did not brief the issue of good faith, though he did allege misrepresentations and omissions in the search warrant affidavit in connection with his request for a *Franks* hearing. Defense counsel made the following arguments regarding the good faith exception at the suppression hearing.

The search warrant affidavit reads, in relevant part, as follows:

> On January 19, 2011, CS conducted a
> monitored and controlled phone call with
> Antonio SANDOVAL SR.  During the phone call,
> Antonio SANDOVAL SR. said he would contact
> Bobby GARCIA and arrange payment for the 40
> kilograms of cocaine that CS delivered to
> New York.

(Mot. to Suppress Ex. A ¶ 11.)  The actual transcript of the phone call, however, does not contain a reference to the delivery of cocaine.  (*See* Mot. to Suppress Ex. C.)  CS and Defendant appear to be discussing CS's need for money so that he could pay an attorney to defend against charges stemming from his November 2010 arrest.  (*See id.*)

In support of the above passage, the Government points to the following excerpt from the monitored phone call:  "During this call, [CS] spoke to Sandoval about his need for money, and about "Bobby" [Garcia].  After CS explains to Sandoval his need for money to pay his bills, Sandoval says, 'Well let me see what we can gather.'"  (Gov't Resp. to Mot. to Suppress at 3.)  To be sure, it is not facially clear that CS and Defendant were discussing a drug debt.  But it is also not surprising that a phone conversation concerning Defendant's drug trade would be less than a model of clarity.  And, the Government submits that CS informed law enforcement that this discussion related to money Garcia owed him for transporting cocaine.  (*Id.*)

25

Defendant offers no convincing reason as to why law enforcement should have doubted CS's credibility. *See United States v. White*, 549 F.3d 946, 952 (4th Cir. 2008) (arrested informant had "every incentive" to cooperate with police; "[h]e hoped to lessen his punishment, and risked additional charges if he gave the officers false information"); *Miller*, 925 F.2d at 699. Defendant thus makes no showing that the affiant knowingly or recklessly made a false statement about the phone call in the search warrant affidavit.

Defendant also cites several omissions from the search warrant affidavit. In challenging a search warrant on the theory that the affiant omitted material facts, the defendant must show "(1) that the officer deliberately or recklessly omitted the information at issue and (2) that the inclusion of this information would have defeated probable cause." *United States v. Andrews*, 577 F.3d 231, 238-39 (4th Cir. 2009) (citing *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).

Specifically, Defendant points out that in the monitored phone call between CS and Defendant, CS mentioned that he "want[ed] to see if Gordo [*i.e.*, Garcia] can pay what he owes me," and Defendant responded: "What's your problem? Were you involved with some people from over there?" (*See* Mot. to Suppress at 17 & Ex. C.) Defendant also cites an excerpt from the monitored phone call in which CS stated that he needed money

from Garcia to pay for an attorney and that Garcia was the only one who could help him. (*Id.* at 16-17 & Ex. C.) Finally, Defendant points to the fact that he asked CS where he was during the phone conversation, and stated that he did not know why Garcia was looking for CS. (*Id.* at 17 & Ex. C.) According to Defendant, these omissions are exculpatory, because they conflict with CS's assertion that he worked for Defendant.

Defendant makes no showing that any of the omissions he cites was the result of intentional or reckless conduct. Moreover, there is no reason to believe that inclusion of the omitted information would have defeated probable cause. Each of the excerpts from the monitored phone call cited by Defendant is ambiguous at best; none is inherently exculpatory. For example, Defendant's questions to CS "[w]hat's your problem?" and "[w]ere you involved with some people from over there?" could very well be asking how CS was arrested and whether someone had compromised his involvement in the conspiracy. Moreover, CS's statement that he needed money from Garcia is unsurprising given that, according to CS, Garcia owed him money for transporting cocaine. And Defendant should not be expected to know CS's precise location at a given time or why specifically a co-conspirator might be looking for him just by virtue of the fact that CS worked for him. For these reasons, the Court finds that

the good faith exception is not rendered inapplicable based on omissions from the search warrant affidavit.

Defendant next argues that the good faith exception does not apply because the facts supporting the search warrant were so lacking in indicia of probable cause as to render belief in its existence objectively unreasonable. The Fourth Circuit rejected a similar argument in *United States v. Perez*, 393 F.3d 457, 462 (4th Cir. 2004). The search warrant in *Perez*, unlike the one at issue here, appears to have been based *solely* on a confidential informant's statement. *Id.* at 459. The court noted several problems with the search warrant affidavit, including that it did not make clear whether the informant was known or anonymous, did not explain the basis for the affiant's conclusion that the source was reliable and credible, and did not explain the nexus between the informant and the alleged wrongdoers. *Id*. at 462. Based on the totality of the information provided to the magistrate, however, the Fourth Circuit found the good faith exception applicable. *Id*. The court noted that the confidential informant's signed statement had also been presented to the magistrate, and revealed that he was known to officers, that his knowledge was derived from personal information rather than hearsay, and that he was acting out of personal concern for his girlfriend. *Id.*

None of the problems noted in *Perez* is present here. The search warrant affidavit (1) makes clear that CS was known, having been arrested by DEA agents in November 2010; (2) gives credence to the notion that CS was reliable and credible, given that he was cooperating with law enforcement over an extended period of time and participating in monitored phone calls; and (3) clearly explains CS's nexus to Defendant, *i.e.*, as a truck driver in Defendant's conspiracy to transport cocaine.

Defendant cites *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996), in support of his motion. There, the Fourth Circuit held that the good faith exception did not apply to a search warrant based on information supplied by an unknown informant whose credibility could not be assessed. *Id*. at 121-22. The Court finds *Wilhelm* distinguishable for the same reasons given in *Perez*. Specifically, *Wilhelm* involved an anonymous phone call, *id.* at 117, which is far different from the in-person meetings that CS engaged in with law enforcement officials. *See Perez*, 393 F.3d at 462 ("Unlike an anonymous tipster, an informant who meets face-to-face with an officer provides the officer with an opportunity to assess his credibility and demeanor and also exposes himself to accountability for making a false statement.") (internal quotation marks omitted). Unlike in *Wilhelm*, officers here were able to observe CS's demeanor and had a basis for assessing his

credibility.  For these reasons, the information provided by CS concerning Defendant's involvement in drug trafficking was not so lacking in indicia of probable cause that belief in its existence was objectively unreasonable.

Defendant also argues that the good faith exception is inapplicable because the facts underlying the search warrant were so lacking in indicia of probable cause connecting Defendant's residence to evidence of criminal activity that no reasonable officer could have relied on it.  The Court rejects this argument.  The Fourth Circuit has consistently upheld warrants to search suspects' residences and even temporary abodes on the basis of "(1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes." *United States v. Williams*, 548 F.3d 311, 319 (4th Cir. 2008) (citing cases).  Here, the search warrant affidavit included information provided by CS in face-to-face meetings that Defendant was involved in a drug conspiracy and referenced a phone call which the CS indicated involved a drug debt.  Similar to *Williams*, the affidavit here also included a "training-and-experience based" explanation of why evidence of drug trafficking was likely to be found at Defendant's residence.

(*See* Mot. to Suppress Ex. B, Statement of Probable Cause ¶ 7)
Accordingly, the search warrant affidavit provided a sufficient
connection between Defendant's residence and criminal activity,
*see Williams*, 548 F.3d at 319-20, and the Court finds the good
faith exception applicable.

### 3. Request for a *Franks* Hearing

Defendant argues in the alternative that he is
entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154
(1978).  In *Franks v. Delaware*, the Supreme Court held that a
defendant may challenge a facially sufficient warrant (1) where
the defendant makes a substantial preliminary showing that a
false statement knowingly and intentionally, or with reckless
disregard for the truth, was included by the affiant in the
search warrant affidavit, and (2) if the allegedly false
statement is necessary to the finding of probable cause.  *Id.* at
155-56.  A defendant can likewise obtain a *Franks* hearing based
on omissions from a search warrant affidavit, but faces a higher
threshold.  *United States v. Clenney*, 631 F.3d 658, 664 (4th
Cir. 2011) (citation omitted).  The defendant must show that the
omissions were "*designed to mislead* or made in *reckless
disregard of whether they would mislead* and that the omissions
were material, meaning that their inclusion in the affidavit
would defeat probable cause."  *Id.* (emphasis in original)
(internal quotation marks and alterations omitted).  A

defendant's showing must be "more than conclusory and should include affidavits or other evidence to overcome the presumption of the warrant's validity." *Id.* at 663. (internal quotation marks and alterations omitted).

For the reasons discussed in Section II.B.2, *supra*, Defendant has failed to demonstrate that he is entitled to a *Franks* hearing. Defendant has not made a substantial preliminary showing that false information was knowingly or recklessly included in the search warrant affidavit. He likewise does not show that the omissions he cites were designed to mislead or would have defeated probable cause. Accordingly, Defendant's request for a *Franks* hearing is denied.

### III. Conclusion

For the following reasons, the Court will deny Defendant's Motion to Dismiss or Transfer and deny Defendant's Motion to Suppress.

An appropriate Order will issue.

<table>
<tr><td></td><td>/s/</td></tr>
<tr><td>November 22, 2011</td><td>James C. Cacheris</td></tr>
<tr><td>Alexandria, Virginia</td><td>UNITED STATES DISTRICT COURT JUDGE</td></tr>
</table>